IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 09-00366-05/07-CR-W-FJG |
| | ) | |
| CAMERON BENNETT, | ) | |
| | ) | |
| Defendant. | ) | |

## PLEA AGREEMENT

Pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, the parties described below have entered into the following plea agreement:

**1. The Parties.** The parties to this agreement are the United States Attorney's Office for the Western District of Missouri (otherwise referred to as "the Government" or "the United States"), represented by Beth Phillips, United States Attorney, and David Ketchmark, First Assistant United States Attorney, and the defendant, Cameron Bennett ("the defendant"), represented by Laine Cardarella.

The defendant understands and agrees that this plea agreement is only between him and the United States Attorney for the Western District of Missouri, and that it does not bind any other federal, state, or local prosecution authority or any other government agency, unless otherwise specified in this agreement.

**2. Defendant's Guilty Plea.** The defendant agrees to and hereby does plead guilty to Count One of the indictment charging him with a violation of 18 U.S.C. § 371, that is, conspiracy to commit bank fraud. By entering into this plea agreement, the defendant admits that he knowingly committed this offense, and is in fact guilty of this offense.

**3. Factual Basis for Guilty Plea.** The parties agree that the facts constituting the offense to which he is pleading guilty are as follows:

During an FBI interview, **William F. Wonder III** (hereinafter "**Wonder**") indicated that some time around June or July 2007, he was at a birthday party when **Schirmer** brought up the idea of "flipping" a property to **David Twitty** (hereinafter "**Twitty**"). **Schirmer** indicated that he knew of a property at 8118 Clearwater Pointe that could be purchased and flipped with everyone involved making a profit. **Wonder** agreed to be the one who would purchase the property and it was his understanding that he would be paid $3,000 for his trouble. The initial plan called for **Wonder** to purchase the property and a secondary purchaser arranged by **Schirmer** would buy the property within twenty-four hours. **Schirmer** instructed **Wonder** to open a savings account at Mazuma Credit Union, based upon the fact that Mazuma employee **Hernandez** could manipulate the records to reflect a substantial savings account balance in the event the lender requested a verification of deposit. **Schirmer** stated that **Hernandez** could accomplish this by transferring funds from linked accounts of the investors in the property. On July 28, 2007, **Wonder** opened his Mazuma account with a $25.00 deposit (the minimum amount necessary to become a credit union member).

Some time around the first week of August 2007, **Schirmer** contacted **Wonder** and advised him that the secondary purchaser had backed out. **Schirmer** informed **Wonder** that he would need to hold on to the property for longer than twenty-four hours, possibly up to thirty days. **Wonder** considered backing out until **Schirmer** informed him that **Claerhout** would be the second purchaser of the residence, thereafter he requested payment of $6,000 from the proceeds.

**Wonder** stated that he never provided **Bennett** with any financial information, but that he, and several others including **Schirmer, and Twitty**. were aware that the loan application contained false and fictitious financial information. In fact, **Schirmer** put **Bennett's** name on the loan application with out **Bennett's** consent or knowledge. On or about August 13, 2007, **Wonder** went to Legacy Land Title at 8540 North Oak Trafficway, Kansas City, Missouri and met with Sherri Elms and **Twitty**. During this meeting, **Wonder** signed the HUD-1 Settlement Statement, as well as other closing documents including the loan application.

Sometime on or about the end of August or the beginning of September 2007, **Wonder** had contact with **Schirmer and Twitty**, who all advised him that **Claerhout** was not going to be able to purchase the 8118 Clearwater Pointe residence unless they could come up with an $80,000 down payment. Thereafter, **Schirmer** arranged for the collection of this down payment amount from several individuals including **Bennett**.

On or about October 26, 2007, **Claerhout** obtained two loans from North American Savings Bank, 12498 South 71 Highway, Grandview, Missouri (hereinafter "Bank"). The first loan was for $637,000 and the second loan was for $77,499.27. The loans were obtained in connection with **Claerhout**'s purchase of a residence located at 8118 Clearwater Pointe, Parkville, Missouri. On or about the same date, **Claerhout** signed a Residential Loan Application stating his income was

$24,110.00/month as an employee of Script Pro. Additionally, the loan application indicated that **Claerhout** had a savings account balance at Mazuma Credit Union of $127,131.36. Both of these statements were false and known by **Claerhout** to be false when he signed the loan application. **Claerhout**'s true salary at Script Pro was $28,758.00 in 2006 and $28,961.00 in 2007, and his savings account balance at Mazuma was artificially inflated by a series of account transactions, that were entered and quickly reversed by **Hernandez**, a Mazuma employee. Based upon these fraudulent representations, the Bank authorized both of these loans.

During an FBI interview, **Claerhout** indicated that he was looking for a new residence because his roommate was getting married. **Claerhout** indicated that he was introduced to **Schirmer** through a mutual friend. **Schirmer** told **Claerhout** that he was in the mortgage industry and he wanted **Claerhout** to purchase a residence at 8118 Clearwater Pointe, Parkville, MO, and hold on to it for a couple of months until it could be sold to a millionaire from Arkansas for a substantial profit. **Claerhout** expressed concern about how he could afford the property and **Schirmer** stated that he knew of several loopholes that could be used to facilitate the transaction and that he had several "investors" willing to finance the down payment.

**Schirmer** met **Claerhout** at Script Pro and had **Claerhout** sign a blank mortgage application, which **Schirmer** said he would fill in later. **Claerhout** also provided **Schirmer** with copies of his payroll statement and W-2. **Claerhout** went to Valore Title at 103rd and State Line in Overland Park, KS to close on the transaction[1]. **Claerhout** also admitted that **Schirmer** had promised him money after the transaction was complete and that **Schirmer** did not follow through on that promise.

Trudy Anderson (hereinafter "Anderson") works as a loan officer for North American Savings Bank and on or about October 2007, she was contacted by **Schirmer** about a home loan for **Claerhout** to purchase a residence at 8118 Clearwater Pointe, Parkville, MO. Anderson only spoke with **Claerhout** on one occasion when she needed two current income statements and W-2's. **Claerhout** referred Anderson to **Schirmer** who faxed these documents to the bank.[2] Anderson also stated that on October 12, 2007, she contacted **Jennifer Hernandez** at Mazuma Credit Union to request a verification of deposit on **Claerhout's** account number 146208, which purported to have a balance of $127,131.36.[3] Anderson said that she initially contacted **Hernandez** by phone to verify

---

[1]The HUD-1 settlement statement indicated that **Claerhout** was purchasing the property from **Wonder** and that he was bringing cash to closing in the amount of $80,606.08.

[2]The documents faxed by **Schirmer** fraudulently stated that **Claerhout** made a gross salary of $11,127.92 during the pay period ending on 09/28/2007 and that he had eared $258,757.76 in taxable year 2006.

[3]An examination of the detail records from Mazuma Credit Union indicate that **Hernandez**'s unique user code engaged in a series of transactions on October 12, 2007, wherein she transferred $127,882.15 into **Claerhout**'s account and then voided out the transfers. These transactions all took place within a 17 minute time frame. **Hernandez** denied ever manipulating accounts when interviewed by the FBI (before these records were obtained).

the information and then she personally drove from her work to Mazuma Credit Union on Englewood and 169 Highway to have **Hernandez** sign the form in her presence. Anderson also provided the FBI with a copy of a "Request for Verification of Rent or Mortgage Account" that purported to be signed by **Katherine Sartain**. The form falsely stated that **Claerhout** was renting a property at 10126 North Montgall Avenue for $4,300/month, and had done so from "June 1, 2006 to present."

**Schirmer** informed **Wonder** that he should be expecting to receive a check at the time of **Claerhout**'s closing for approximately $154,743.90. **Schirmer** told **Wonder** to deposit this check into his account at Mazuma Credit Union and thereafter **Hernandez** would distribute the money in the amounts per instructions she would receive.

**Wonder** recalls receiving the check from an individual at Valore Title, which he deposited into his Mazuma account on or about October 29, 2007. Bank records confirm this deposit, and also confirm that the proceeds were distributed out of his account on the same day. The following is a break down on the distribution: $47,000 check to Paul Burns; $12,500 check to Cameron **Bennett**; $15,000 to Scott **Schirmer**; and $80,243.90 check to Fountain City Investment Group.

The check made payable to "Fountain City Investment Group[4]" was deposited by **Wonder** into a business account at Mazuma Credit Union. On November 1, 2007, **Wonder** wrote a $80,252.75 check to **Schirmer** on this account, based upon **Schirmer**'s representations that this money would be used to make mortgage payments on the 8118 Clearwater Pointe residence for **Claerhout.** On that same day, **Schirmer** wrote a $29,980 check back to **Wonder** to pay him for his part of the down payment (roughly $19,000) and his part of the proceeds (roughly $10,000).

Some time in November or December 2007, Kenny Cleveland informed **Wonder** and **Twitty** that he (Cleveland) received a call from **Hernandez** at Mazuma Credit Union advising him that **Schirmer** was spending the $80,000 for personal expenses and travel and there was little or nothing left to make mortgage payments on the 8118 Clearwater Pointe property.

**Twitty** was also interviewed by the FBI and stated that he personally did not financially benefit from the purchase and/or sale of 8118 Clearwater Pointe. **Twitty** admitted to providing $8,500 to **Claerhout** for his down payment on the property (which was all he claims was returned to him after the transaction). **Twitty** did acknowledge that he was aware that false income figures and financial documents were created for **Claerhout** to purchase the property, but he declined to discuss who created the documents and then directed the agents to his attorney, Jean Paul Bradshaw.

During a separate interview with the FBI, **Bennett** informed the agents that he worked for Vested Mortgage Group along with **Schirmer**. **Bennett** said that he was a mortgage loan broker and that some point he attended a meeting with **Schirmer** and Steve Angelo (then owner of Vested Mortgage). During that meeting, **Bennett** learned that **Schirmer** had filled out a Uniform

---

[4]Fountain City Investment Group is the name of **Wonder** and **Twitty**'s investment company.

Case 4:09-cr-00366-FJG   Document 102   Filed 03/30/11   Page 4 of 16

Residential Loan Application for **Wonder** as part of the application process to purchase a residence located at 8118 Clearwater Pointe, Parkville, MO. Angelo also stated that **Schirmer** had placed **Bennett**'s name at the end of the application stating he was the loan officer who obtained all the financial information. **Bennett** stated that he never obtained any financial information from **Wonder** and he did not sign the application.

On or about October 2007, **Schirmer** requested a loan from **Bennett** to help with the down payment on the purchase of 8118 Clearwater Pointe. **Bennett** said he provided the money with an understanding that he would be reimbursed from the profit made on the eventual sale of this residence. Additionally, **Bennett** informed the FBI that he was aware that **Claerhout** did not qualify nor did he have a sufficient down payment to purchase the property. Nonetheless, **Bennett** agreed to provide money to assist with the down payment and he called **Hernandez** at Mazuma Credit Union and had her transfer money into the account designated by **Schirmer**. After the closing on the property, **Schirmer** paid **Bennett** the money back plus a modest additional sum.

As of April 2, 2009, North American Savings Bank has foreclosed on 8118 Clearwater Pointe and subsequently sold the property. The bank suffered a loss of $349,650.82 as a result of the fraud. The net profit from the fraud was $154,743.90.

**4. Use of Factual Admissions and Relevant Conduct.** The defendant acknowledges, understands and agrees that the admissions contained in Paragraph 3 and other portions of this plea agreement will be used for the purpose of determining his guilt and advisory sentencing range under the United States Sentencing Guidelines ("U.S.S.G."), including the calculation of the defendant's offense level in accordance with U.S.S.G. § 1B1.3(a)(2). The defendant acknowledges, understands and agrees that the conduct charged in any dismissed counts of the indictment as well as all other uncharged related criminal activity may be considered as "relevant conduct" pursuant to U.S.S.G. § 1B1.3(a)(2) in calculating the offense level for the charge to which he is pleading guilty.

**5. Statutory Penalties.** The defendant understands that upon his plea of guilty to Count One of the indictment charging him with conspiracy to commit bank fraud, the maximum penalty the Court may impose is not more than five years of imprisonment, a $250,000 fine, three years of supervised release, an order of restitution and a $100 mandatory special assessment per felony count

of conviction which must be paid in full at the time of sentencing. The defendant further understands that this offense is a Class D felony.

      **6. Sentencing Procedures.** The defendant acknowledges, understands and agrees to the following:

      a. in determining the appropriate sentence, the Court will consult and consider the United States Sentencing Guidelines promulgated by the United States Sentencing Commission; these Guidelines, however, are advisory in nature, and the Court may impose a sentence either less than or greater than the defendant's applicable Guidelines range, unless the sentence imposed is "unreasonable";

      b. the Court will determine the defendant's applicable Sentencing Guidelines range at the time of sentencing;

      c. in addition to a sentence of imprisonment, the Court may impose a term of supervised release of up to three years; that the Court must impose a period of supervised release if a sentence of imprisonment of more than one year is imposed;

      d. if the defendant violates a condition of his supervised release, the Court may revoke his supervised release and impose an additional period of imprisonment of up to two years without credit for time previously spent on supervised release. In addition to a new term of imprisonment, the Court also may impose a new period of supervised release, the length of which cannot exceed three years, less the term of imprisonment imposed upon revocation of the defendant's first supervised release;

      e. the Court may impose any sentence authorized by law, including a sentence that is outside of, or departs from, the applicable Sentencing Guidelines range;

      f. any sentence of imprisonment imposed by the Court will not allow for parole;

      g. the Court is not bound by any recommendation regarding the sentence to be imposed or by any calculation or estimation of the Sentencing Guidelines range offered by the parties or the United States Probation Office; and

      h. the defendant may not withdraw his guilty plea solely because of the nature or length of the sentence imposed by the Court.

      i. within 10 days of the execution of this plea agreement, at the request of the USAO, the defendant agrees to execute and submit (1) a Tax Information Authorization form; (2) an Authorization to Release Information; (3) a completed financial disclosure statement; and

(4) copies of financial information that the defendant submits to the U.S. Probation Office. The defendant understands that the United States will use the financial information when making its recommendation to the Court regarding the defendant's acceptance of responsibility.

j. At the request of the USAO, the defendant agrees to undergo any polygraph examination the United States might choose to administer concerning the identification and recovery of forfeitable assets and restitution.

**7. Government's Agreements.** Based upon evidence in its possession at this time, the United States Attorney's Office for the Western District of Missouri, as part of this plea agreement, agrees not to bring any additional charges against defendant for any federal criminal offenses related to the conspiracy to commit bank fraud for which it has venue and which arose out of the defendant's conduct described above. Additionally, the United States agrees to dismiss Count Two of the indictment at the time of sentencing.

The defendant understands that this plea agreement does not foreclose any prosecution for an act of murder or attempted murder, an act or attempted act of physical or sexual violence against the person of another, or a conspiracy to commit any such acts of violence or any criminal activity of which the United States Attorney for the Western District of Missouri has no knowledge.

The defendant recognizes that the United States' agreement to forego prosecution of all of the criminal offenses with which the defendant might be charged is based solely on the promises made by the defendant in this agreement. If the defendant breaches this plea agreement, the United States retains the right to proceed with the original charges and any other criminal violations established by the evidence. The defendant expressly waives his right to challenge the initiation of the dismissed or additional charges against him if he breaches this agreement. The defendant expressly waives his right to assert a statute of limitations defense if the dismissed or additional charges are initiated against him following a breach of this agreement. The defendant further

-7-

Case 4:09-cr-00366-FJG   Document 102   Filed 03/30/11   Page 7 of 16

understands and agrees that if the Government elects to file additional charges against him following his breach of this plea agreement, he will not be allowed to withdraw his guilty plea.

      8. **Preparation of Presentence Report.** The defendant understands the United States will provide to the Court and the United States Probation Office a government version of the offense conduct. This may include information concerning the background, character, and conduct of the defendant, including the entirety of his criminal activities. The defendant understands these disclosures are not limited to the count to which he has pleaded guilty. The United States may respond to comments made or positions taken by the defendant or the defendant's counsel and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject only to any limitations set forth in this plea agreement. The United States and the defendant expressly reserve the right to speak to the Court at the time of sentencing pursuant to Rule 32(i)(4) of the Federal Rules of Criminal Procedure.

      9. **Withdrawal of Plea.** Either party reserves the right to withdraw from this plea agreement for any or no reason at any time prior to the entry of the defendant's plea of guilty and its formal acceptance by the Court. In the event of such withdrawal, the parties will be restored to their pre-plea agreement positions to the fullest extent possible. However, after the plea has been formally accepted by the Court, the defendant may withdraw his plea of guilty only if the Court rejects the plea agreement or if the defendant can show a fair and just reason for requesting the withdrawal. The defendant understands that if the Court accepts his plea of guilty and this plea agreement but subsequently imposes a sentence that is outside the defendant's applicable Sentencing

Guidelines range, or imposes a sentence that the defendant does not expect, like or agree with, he will not be permitted to withdraw his plea of guilty.

**10. <u>Agreed Guidelines Applications</u>.** With respect to the application of the Sentencing Guidelines to this case, the parties stipulate and agree as follows:

    a. The Sentencing Guidelines do not bind the Court and are advisory in nature. The Court may impose a sentence that is either above or below the defendant's applicable Guidelines range, provided the sentence imposed is not "unreasonable";

    b. The applicable Guidelines section for the offense of conviction is U.S.S.G. § 2B1.1(a)(2), which provides for a base offense level of 6;

    c. The loss attributed to this defendant is equal to $349,650.82 and therefore a 12 level enhancement would apply pursuant to U.S.S.G. § 2B1.1(b)(1)(G);

    d. Based upon the defendant's role in the offense she is entitled to a three level reduction pursuant to U.S.S.G. § 3B1.2;

    e. The defendant has admitted his guilt and clearly accepted responsibility for his actions therefore, he is entitled to a two-level reduction pursuant to § 3E1.1(b) of the Sentencing Guidelines;

    f. There is no agreement between the parties regarding the defendant's criminal history category. The parties agree that the Court will determine his applicable criminal history category after receipt of the presentence investigation report prepared by the United States Probation Office;

    g. The defendant understands that the estimate of the parties with respect to the Guidelines computation set forth in the subsections of this paragraph does <u>not</u> bind the Court or the United States Probation Office with respect to the appropriate Guidelines levels. Additionally, the failure of the Court to accept these stipulations will not, as outlined in Paragraph 9 of this plea agreement, provide the defendant with a basis to withdraw his plea of guilty;

    h. The United States agrees not to seek an upward departure from the Guidelines or a sentence outside the Guidelines range. However, defendant reserves his right to seek a downward departure from the Guidelines or a sentence outside the Guidelines range. The agreement by the parties is not binding upon the Court or the United States Probation Office and the Court may impose any sentence authorized

by law, including any sentence outside the applicable Guidelines range that is not "unreasonable";

      i. The defendant consents to judicial fact-finding by a preponderance of the evidence for all issues pertaining to the determination of the defendant's sentence and any legally authorized increase above the normal statutory maximum. The defendant waives any right to a jury determination beyond a reasonable doubt of all facts used to determine and enhance the sentence imposed, and waives any right to have those facts alleged in the indictment. The defendant also agrees that the Court, in finding the facts relevant to the imposition of sentence, may consider any reliable information, including hearsay; and

      j. The defendant understands and agrees that the factual admissions contained in Paragraph 3 of this plea agreement, and any admissions that he will make during his plea colloquy, support the imposition of the agreed-upon Guidelines calculations contained in this agreement.

**11. Effect of Non-Agreement on Guidelines Applications.** The parties understand, acknowledge and agree that there are no agreements between the parties with respect to any Sentencing Guidelines issues other than those specifically listed in Paragraph 10, and its subsections. As to any other Guidelines issues, the parties are free to advocate their respective positions at the sentencing hearing.

**12. Change in Guidelines Prior to Sentencing.** The defendant agrees that if any applicable provision of the Guidelines changes after the execution of this plea agreement, then any request by defendant to be sentenced pursuant to the new Guidelines will make this plea agreement voidable by the United States at its option. If the Government exercises its option to void the plea agreement, the United States may charge, reinstate, or otherwise pursue any and all criminal charges that could have been brought but for this plea agreement.

**13. Government's Reservation of Rights.** The defendant understands that the United States expressly reserves the right in this case to:

-10-

a. oppose or take issue with any position advanced by defendant at the sentencing hearing which might be inconsistent with the provisions of this plea agreement;

b. comment on the evidence supporting the charge in the indictment;

c. oppose any arguments and requests for relief the defendant might advance on an appeal from the sentences imposed and that the United States remains free on appeal or collateral proceedings to defend the legality and propriety of the sentence actually imposed, even if the Court chooses not to follow any recommendation made by the United States; and

d. oppose any post-conviction motions for reduction of sentence, or other relief.

**14. <u>Waiver of Constitutional Rights</u>.** The defendant, by pleading guilty, acknowledges that he has been advised of, understands, and knowingly and voluntarily waives the following rights:

a. the right to plead not guilty and to persist in a plea of not guilty;

b. the right to be presumed innocent until his guilt has been established beyond a reasonable doubt at trial;

c. the right to a jury trial, and at that trial, the right to the effective assistance of counsel;

d. the right to confront and cross-examine the witnesses who testify against him;

e. the right to compel or subpoena witnesses to appear on his behalf; and

f. the right to remain silent at trial, in which case his silence may not be used against him.

The defendant understands that by pleading guilty, he waives or gives up those rights and that there will be no trial. The defendant further understands that if he pleads guilty, the Court may ask him questions about the offense or offenses to which he pleaded guilty, and if the defendant answers those questions under oath and in the presence of counsel, his answers may later be used against him in a prosecution for perjury or making a false statement. The defendant also understands

-11-

he has pleaded guilty to a felony offense and, as a result, will lose his right to possess a firearm or ammunition and might be deprived of other rights, such as the right to vote or register to vote, hold public office, or serve on a jury.

**15. <u>Waiver of Appellate and Post-Conviction Rights</u>.**

    a. The defendant acknowledges, understands and agrees that by pleading guilty pursuant to this plea agreement he waives his right to appeal or collaterally attack a finding of guilt following the acceptance of this plea agreement, except on grounds of (1) ineffective assistance of counsel; or (2) prosecutorial misconduct.

    b. The defendant expressly waives his right to appeal his sentence, directly or collaterally, on any ground except claims of (1) ineffective assistance of counsel; (2) prosecutorial misconduct; or (3) an illegal sentence. An "illegal sentence" includes a sentence imposed in excess of the statutory maximum, but does *not* include less serious sentencing errors, such as a misapplication of the Sentencing Guidelines, an abuse of discretion, or the imposition of an unreasonable sentence. However, if the United States exercises its right to appeal the sentence imposed as authorized by 18 U.S.C. § 3742(b), the defendant is released from this waiver and may, as part of the Government's appeal, cross-appeal his sentence as authorized by 18 U.S.C. § 3742(a) with respect to any issues that have not been stipulated to or agreed upon in this agreement.

**16. <u>Financial Obligations</u>.** By entering into this plea agreement, the defendant represents that he understands and agrees to the following financial obligations:

    a. The Court must order restitution to the victim of the offense to which the defendant is pleading guilty. The defendant agrees that the Court may order restitution in connection with the conduct charged in any counts of the indictment which are to be dismissed and all other uncharged related criminal activity.

    b. The United States may use the Federal Debt Collection Procedures Act and any other remedies provided by law to enforce any restitution order that may be entered as part of the sentence in this case and to collect any fine.

    c. The defendant will fully and truthfully disclose all assets and property in which he has any interest, or over which the defendant exercises control directly or indirectly, including assets and property held by a spouse, nominee or other third party. The defendant's disclosure obligations are ongoing, and are in force from the execution of this agreement until the defendant has satisfied the restitution order in full.

-12-

Case 4:09-cr-00366-FJG   Document 102   Filed 03/30/11   Page 12 of 16

d. Within 10 days of the execution of this plea agreement, at the request of the USAO, the defendant agrees to execute and submit (1) a Tax Information Authorization form; (2) an Authorization to Release Information; (3) a completed financial disclosure statement; and (4) copies of financial information that the defendant submits to the U.S. Probation Office. The defendant understands that compliance with these requests will be taken into account when the United States makes a recommendation to the Court regarding the defendant's acceptance of responsibility.

e. At the request of the USAO, the defendant agrees to undergo any polygraph examination the United States might choose to administer concerning the identification and recovery of substitute assets and restitution.

f. The defendant hereby authorizes the USAO to obtain a credit report pertaining to him to assist the USAO in evaluating the defendant's ability to satisfy any financial obligations imposed as part of the sentence.

g. The defendant understands that a Special Assessment will be imposed as part of the sentence in this case. The defendant promises to pay the Special Assessment of $100 by submitting a satisfactory form of payment to the Clerk of the Court prior to appearing for the sentencing proceeding in this case. The defendant agrees to provide the Clerk's receipt as evidence of his fulfillment of this obligation at the time of sentencing.

h. The defendant certifies that he has made no transfer of assets or property for the purpose of (1) evading financial obligations created by this Agreement; (2) evading obligations that may be imposed by the Court; nor (3) hindering efforts of the USAO to enforce such financial obligations. Moreover, the defendant promises that he will make no such transfers in the future.

i. In the event the United States learns of any misrepresentation in the financial disclosure statement, or of any asset in which the defendant had an interest at the time of this plea agreement that is not disclosed in the financial disclosure statement, and in the event such misrepresentation or nondisclosure changes the estimated net worth of the defendant by ten thousand dollars ($10,000.00) or more, the United States may at its option: (1) choose to be relieved of its obligations under this plea agreement; or (2) let the plea agreement stand, collect the full forfeiture, restitution, and fines imposed by any criminal or civil judgment, and also collect 100% (one hundred percent) of the value of any previously undisclosed assets. The defendant agrees not to contest any collection of such assets. In the event the United States opts to be relieved of its obligations under this plea agreement, the defendant's previously entered pleas of guilty shall remain in effect and cannot be withdrawn.

**17. Waiver of FOIA Request.** The defendant waives all of his rights, whether asserted

-13-

directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case including, without limitation, any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act of 1974, 5 U.S.C. § 552a.

      **18. Waiver of Claim for Attorney's Fees.** The defendant waives all of his claims under the Hyde Amendment, 18 U.S.C. § 3006A, for attorney's fees and other litigation expenses arising out of the investigation or prosecution of this matter.

      **19. Defendant's Breach of Plea Agreement.** If the defendant commits any crimes, violates any conditions of release, or violates any term of this plea agreement between the signing of this plea agreement and the date of sentencing, or fails to appear for sentencing, or if the defendant provides information to the Probation Office or the Court that is intentionally misleading, incomplete, or untruthful, or otherwise breaches this plea agreement, the United States will be released from its obligations under this agreement. The defendant, however, will remain bound by the terms of the agreement, and will not be allowed to withdraw his plea of guilty.

      The defendant also understands and agrees that in the event he violates this plea agreement, all statements made by him to law enforcement agents subsequent to the execution of this plea agreement, any testimony given by him before a grand jury or any tribunal or any leads from such statements or testimony shall be admissible against him in any and all criminal proceedings. The defendant waives any rights that he might assert under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that pertains to the admissibility of any statements made by him subsequent to this plea agreement.

**20. Defendant's Representations.**  The defendant acknowledges that he has entered into this plea agreement freely and voluntarily after receiving the effective assistance, advice and approval of counsel.  The defendant acknowledges that he is satisfied with the assistance of counsel, and that counsel has fully advised him of his rights and obligations in connection with this plea agreement.  The defendant further acknowledges that no threats or promises, other than the promises contained in this plea agreement, have been made by the United States, the Court, his attorneys or any other party to induce him to enter his plea of guilty.

**21. No Undisclosed Terms.**  The United States and defendant acknowledge and agree that the above-stated terms and conditions, together with any written supplemental agreement that might be presented to the Court in camera, constitute the entire plea agreement between the parties, and that any other terms and conditions not expressly set forth in this agreement or any written supplemental agreement do not constitute any part of the parties' agreement and will not be enforceable against either party.

**22. Standard of Interpretation.**  The parties agree that, unless the constitutional implications inherent in plea agreements require otherwise, this plea agreement should be interpreted according to general contract principles and the words employed are to be given their normal and ordinary meanings.  The parties further agree that, in interpreting this agreement, any drafting errors or ambiguities are not to be automatically construed against either party, whether or not that party

was involved in drafting or modifying this agreement.

                                  Beth Phillips
                                  United States Attorney

Dated: 3/29/11                     /s/ David Ketchmark
                                  David Ketchmark
                                  First Assistant United States Attorney

      I have consulted with my attorney and fully understand all of my rights with respect to the offense charged in the indictment. Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines. I have read this plea agreement and carefully reviewed every part of it with my attorney. I understand this plea agreement and I voluntarily agree to it.

Dated: 3/30/11                     /s/ Cameron Bennett
                                  Cameron Bennett
                                  Defendant

      I am defendant Cameron Bennett's attorney. I have fully explained to him his rights with respect to the offense charged in the indictment. Further, I have reviewed with him the provisions of the Sentencing Guidelines which might apply in this case. I have carefully reviewed every part of this plea agreement with him. To my knowledge, Cameron Bennett's decision to enter into this plea agreement is an informed and voluntary one.

Dated: 3/30/11                     /s/ Laine Cardarella
                                  Laine Cardarella
                                  Attorney for Defendant